Merrimack
No. 97-682

NANCY AND CHARLES HACKING, JR.,
AS PARENTS AND NEXT FRIENDS OF CHELSEA HACKING

v.

TOWN OF BELMONT & a.

May 14, 1999

*Nixon, Raiche, Manning & Casinghino, P.A.*, of Manchester (*Gary L. Casinghino* on the brief and orally), for the plaintiffs.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Donald E. Gardner* and *Dyana J. Crahan* on the brief, and *Ms. Crahan* orally), for the defendants.

BROCK, C.J. This is an interlocutory appeal, *see* SUP. CT. R. 8, by the defendants, the Town of Belmont and the Shaker Regional School District, from a ruling of the Superior Court (*Arnold*, J.) denying their motion to dismiss. The plaintiffs, Nancy and Charles Hacking, Jr., have asserted several theories of negligence against the defendants for injuries that their daughter, Chelsea Hacking, sustained in a basketball game. We affirm in part, reverse in part, and remand.

The plaintiffs have alleged the following facts. On or about January 27, 1995, when she was a sixth grade student at the Canterbury Elementary School, Chelsea participated in a girls basketball game against a team from the Belmont Elementary School. During that game, which was organized by the defendants and/or the Town of Canterbury, the referees, coaches, instructors, and employees of the defendants permitted the game to escalate out of control. Belmont players twice knocked Chelsea down and stepped on her leg. As a result, she suffered permanent injury to her left leg, underwent surgery and other medical treatment, and will require future medical care.

The plaintiffs brought an action against the defendants alleging several theories of negligence. In the first count of their writ, they alleged that the defendants breached a duty to exercise reasonable care and supervision of the game, to ensure that the game was kept under reasonable control, and to prevent the game from escalating out of control (Count I). In the second count, they alleged under a theory of *respondeat superior* that the defendants' employees, coaches, instructors, and referees breached a duty to supervise and control the game properly and to ensure that the participants played in a safe manner (Count II). In the third count, they alleged that the defendants failed to train and supervise properly their employees, coaches, instructors, and referees to conduct the game (Count III).

The defendants moved to dismiss for failure to state a claim upon which relief may be granted, arguing that the doctrines of discretionary function immunity and assumption of the risk warranted dismissal of the plaintiffs' claims. The defendants argued that their decisions concerning the organization of the game, such as who to select as coaches and referees and how much training to provide them, were discretionary and entitled to immunity. Likewise, they argued that the referees' decisions regarding the appropriate calls to make during the game were discretionary. The defendants further argued that Chelsea voluntarily assumed the risk of accidental injury that is inherent in the game of basketball.

The trial court denied the motion to dismiss. The court noted that to the extent the plaintiffs' writ refers to the defendants' discretionary decisions in planning and setting policy regarding school sports, the defendants are entitled to immunity. Reading the allegations in the light most favorable to the plaintiffs, however, the court concluded that the claims refer not to basic policy decisions, but to ministerial conduct. The court also ruled that the doctrine of assumption of the risk did not, as a matter of law, bar the plaintiffs' claims.

The defendants moved to reconsider, reasserting their immunity arguments. In addition, they argued that the referees and coaches, who they asserted were volunteers, were themselves immune from liability by statute. *See* RSA 508:17, I (1997) (amended 1998). Because the coaches and referees were immune from liability, they argued, no liability could be imputed to the defendants under a *respondeat superior* theory. The court denied their motion for reconsideration, and this interlocutory appeal ensued.

On appeal the defendants contend that the trial court erred in: (1) ruling that the defendants are not entitled to discretionary function

immunity for their decisions regarding the selection, training, and supervision of the coaches and referees who participated in the game, and for the decisions made by the coaches and referees during the game; (2) denying the motion to dismiss on the grounds that the plaintiffs' claims are not barred by assumption of the risk; and (3) failing to address the defendants' assertion that the plaintiffs' claim of *respondeat superior* liability must fail.

In reviewing an order on a motion to dismiss for failure to state a claim upon which relief may be granted, "we ask whether the plaintiff[s'] allegations are reasonably susceptible of a construction that would permit recovery." *Konefal v. Hollis/Brookline Coop. School Dist.*, 143 N.H. 256, 258, 723 A.2d 30, 32 (1998) (quotation omitted). "We assume the truth of the plaintiff[s'] well pleaded allegations of fact and construe all reasonable inferences from them most favorably to the plaintiff[s]." *Hickingbotham v. Burke*, 140 N.H. 28, 30, 662 A.2d 297, 299 (1995) (quotation and ellipsis omitted).

## I. Discretionary Function Immunity

The defendants' first allegation of error requires us to review once again the doctrine of discretionary function immunity. In *Merrill v. Manchester*, 114 N.H. 722, 729, 332 A.2d 378, 383 (1974), we abrogated the doctrine of municipal immunity. In so doing, we established that as a general rule, municipalities are "subject to the same rules as private corporations if a duty has been violated and a tort committed." *Id.* at 730, 332 A.2d at 383.

As an exception to the general rule, however, we held that municipalities are immune from liability for acts and omissions that constitute "the exercise of an executive or planning function involving the making of a basic policy decision which is character- ized by the exercise of a high degree of official judgment or discretion." *Id.* at 729, 332 A.2d at 383. We have recognized that "[c]ertain essential, fundamental activities of government must remain immune from tort liability so that our government can govern." *Mahan v. N.H. Dep't of Admin. Services*, 141 N.H. 747, 750, 693 A.2d 79, 82 (1997) (quotation and brackets omitted) (decided under the discretionary function exception to the State's waiver of sovereign immunity). Accordingly, in evaluating whether the trial court erred, we must "distinguish between planning or discretionary functions and functions that are purely ministerial." *Bergeron v. City of Manchester*, 140 N.H. 417, 421, 666 A.2d 982, 984 (1995).

We have refused to adopt a bright line rule to determine whether conduct constitutes discretionary planning or merely the ministerial

implementation of a plan. *See id.* at 421, 666 A.2d at 985; *Gardner v. City of Concord,* 137 N.H. 253, 258, 624 A.2d 1337, 1340 (1993). We have, however, adopted the following test:

> When the particular conduct which caused the injury is one characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning, governmental entities should remain immune from liability.

*Bergeron,* 140 N.H. at 421, 666 A.2d at 984 (quotation omitted). In applying this test, "[w]e distinguish policy decisions involving the consideration of competing economic, social, and political factors from operational or ministerial decisions required to implement the policy decisions." *Mahan,* 141 N.H. at 750, 693 A.2d at 82.

▮ To the extent that the plaintiffs challenge the defendants' decisions regarding the training and supervision of the coaches and referees, the defendants are immune from liability. There is no question that the decision whether or not to have a fifth and sixth grade girls basketball program is characterized by a high degree of discretion in making public policy and planning choices. *See Bergeron,* 140 N.H. at 421, 666 A.2d at 984 (quotation omitted); *cf. DiFruscia v. N.H. Dept. of Pub. Works & Highways,* 136 N.H. 202, 205, 612 A.2d 1326, 1328 (1992) (decided under the discretionary function exception to the State's waiver of sovereign immunity) (decision whether or not to place a guardrail on a highway is discretionary). Likewise, the decisions regarding what training and supervision to provide those whom the defendants chose to run the program are planning decisions requiring a high degree of discretion. *Cf. Bergeron,* 140 N.H. at 425, 666 A.2d at 987 (because ultimate decision regarding traffic controls at intersection was discretionary, intermediate decision regarding whether to have staff keep track of accidents at intersection also discretionary). These decisions necessarily involve the most prudent allocation of municipal resources, and thus the weighing of "competing economic, social, and political factors." *Mahan,* 141 N.H. at 750, 693 A.2d at 82; *cf. Phillips v. Thomas,* 555 So. 2d 81, 85 (Ala. 1989) (defendant entitled to discretionary function immunity for negligent training and supervision claim); *Brooks v. Logan,* 903 P.2d 73, 77 (Idaho 1995) (school district entitled to discretionary function immunity for failure to train staff to prevent student suicide); *Erskine v. Commissioner of Corrections,* 682 A.2d 681, 686 (Me. 1996) (defendants' actions in training and supervising personnel protected by discre-

tionary immunity); *Miller v. Szelenyi*, 546 A.2d 1013, 1021 (Me. 1988) (proper supervision and control of employees required exercise of discretion). Accordingly, the trial court should have dismissed Count III, and we reverse its decision with respect to that count.

Although the plaintiffs acknowledge that the issue of training might involve some degree of a policy judgment, they assert that a reasonable jury could conclude that the defendants negligently entrusted the safety and care of students to improperly trained referees and coaches. Thus, they argue that if we construe the allegations most favorably to them, Count III should be allowed to stand. This argument misses the mark. The plaintiffs have alleged conduct in Count III that constitutes inherently discretionary policy judgments, and is entitled to immunity.

The defendants assert that they are entitled to immunity for their decisions regarding not only the training and supervision of the coaches and referees, but also the *selection* of the coaches and referees. In arguing that the trial court erred on this issue, the defendants state that the plaintiffs' claim for negligent training and supervision should have been dismissed in part because the decision to rely on parent volunteers as referees and coaches was discretionary. Count III, however, alleges only that the defendants "failed to properly train and supervise" the referees and coaches. Moreover, plaintiffs' counsel conceded at oral argument that they had not alleged negligent selection of referees and coaches. Accordingly, we find it unnecessary to address whether the selection of the referees or coaches was entitled to immunity.

The defendants next argue that the decisions made by the referees and coaches in the course of the game were entitled to discretionary function immunity. Decisions such as whether to call a foul, whether to replace one player with another, or whether a team has scored, according to the defendants, are inherently discretionary and require the weighing of alternatives. The defendants contend that discretionary function immunity should extend not only to "high-level" decisions, but to decisions made at any level when those decisions "involve the weighing of alternatives regarding the implementation or allocation of municipal resources." Accordingly, the defendants argue that the decisions of the referees and coaches are precisely the sort of decisions that ought to be afforded immunity. The only conduct that should be considered ministerial, according to the defendants, is conduct that involves the mere execution of a set task, requiring no independent judgment.

Although the level of government at which a decision is made is not dispositive of whether the municipality is entitled to immunity, *see Gardner*, 137 N.H. at 258, 624 A.2d at 1340, ministerial conduct is not limited to conduct requiring no judgment whatsoever. Indeed, "it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail." 18 E. MCQUILLIN, MUNICIPAL CORPORATIONS § 53.04.10, at 157 (3d ed. rev. 1993) (quotation and brackets omitted); *see also Whitney v. City of Worcester*, 366 N.E.2d 1210, 1217 (Mass. 1977) (distinction is not merely between discretionary and non-discretionary functions as all functions involve some degree of judgment). While "[n]ot all governmental decisions involving an element of discretion fall within the discretionary function exception," the exception does apply "when a decision entails governmental planning or policy formulation, involving the evaluation of economic, social, and political considerations." *Mahan*, 141 N.H. at 751, 693 A.2d at 83.

Assuming the truth of the plaintiffs' allegations, we conclude that the decisions of the referees and coaches, while perhaps involving some discretion and judgment, were not decisions that concerned municipal planning and public policy. *See Bergeron*, 140 N.H. at 421, 666 A.2d at 984. These decisions did not involve the weighing of competing social, economic, or political factors. *See Mahan*, 141 N.H. at 751, 693 A.2d at 83; *cf. Ransom v. City of Garden City*, 743 P.2d 70, 73 (Idaho 1987); *Adriance v. Town of Standish*, 687 A.2d 238, 241 (Me. 1996). Rather, the plaintiffs have alleged negligence on the part of the referees and coaches in the implementation of the school basketball program.

■ The discretionary function exception "was not designed to cloak the ancient doctrine of [municipal] immunity in modern garb." *Adriance*, 687 A.2d at 241 (quotation omitted). Elevating the decisions of referees and coaches in the course of an elementary school basketball game to the level of governmental planning or policy formulation would indeed undermine the rule of *Merrill* establishing immunity as the exception. Accordingly, we hold that the trial court did not err in denying the motion to dismiss on the grounds that the decisions of the referees and coaches were not entitled to discretionary function immunity.

The defendants contend, however, that public policy considerations militate against imposing liability for the negligence of public school officials who administer school-sponsored athletic events.

Although the plaintiffs do not include the referees and coaches as defendants in this case, the defendants assert that permitting such liability could discourage individuals from volunteering in these events. The legislature, however, has provided a method by which volunteers of governmental entities may obtain immunity from ordinary negligence. RSA 508:17, I. Thus, the defendants' concerns are largely academic. Moreover, these concerns must be weighed against our determination in *Merrill* that forcing an individual to bear the loss caused by the negligence of a municipal employee "offends the basic principles of equality of burdens and of elementary justice." *Merrill*, 114 N.H. at 724, 332 A.2d at 380. Accordingly, we decline to create an additional exception to *Merrill* for public school-sponsored sporting events.

## II. Assumption of the Risk

We next address the defendants' contention that the plaintiffs' claims are barred by assumption of the risk. In New Hampshire, "participants in . . . sports [other than sports in which the legislature has explicitly so provided] do not assume, as a matter of law, the dangers inherent in those sports." *Nutbrown v. Mount Cranmore*, 140 N.H. 675, 682, 671 A.2d 548, 552 (1996). The defendants do not dispute that "[t]he doctrine of primary assumption of the risk, as a common law defense, has been rejected by this court." *Id.* at 681, 671 A.2d at 551. Rather, they argue that we ought to revive the doctrine in the limited instance of public school-sponsored activities. Because New Hampshire public schools face increasing liability for their extracurricular programs, the defendants argue that they should be afforded an exception. Otherwise, public schools will abandon such programs.

Even if we were to create such an exception, however, it is settled law that "a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character." RESTATEMENT (SECOND) OF TORTS § 496D (1965). While one participating in a sport might "consent[] to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation," *Morgan v. State*, 685 N.E.2d 202, 207 (N.Y. 1997), one does not ordinarily assume an "unreasonably increased or concealed" risk, *Benitez v. New York City Bd. of Educ.*, 541 N.E.2d 29, 33 (N.Y. 1989) (quotation omitted). The plaintiffs have alleged in this case that the referees lost control of the game. Assuming the truth of this allegation, and drawing all

reasonable inferences in their favor, we cannot say as a matter of law that this was an ordinary risk inherent within the game of basketball that Chelsea or her parents would have known and appreciated. *Cf. Morgan*, 685 N.E.2d at 210. Accordingly, we affirm the trial court's denial of the motion to dismiss on this ground.

## III. Respondeat Superior

Finally, we address the defendants' argument that because the referees and coaches are immune under RSA 508:17, I, their immunity must be imputed to the defendants under *respondeat superior*, the trial court erred in failing to address this argument, and Count II should have been dismissed. RSA 508:17, I, provides:

> Any volunteer of a nonprofit organization or government entity shall be immune from civil liability in any action brought on the basis of any act or omission resulting in damage or injury to any person if:
>
> (a) The volunteer had prior written approval from the organization to act on behalf of the organization; and
>
> (b) The volunteer was acting in good faith and within the scope of his official functions and duties with the organization; and
>
> (c) The damage or injury was not caused by willful, wanton, or grossly negligent misconduct by the volunteer.

"Volunteer" under this statute is defined as

> an individual performing services for a nonprofit organization or government entity who does not receive compensation, other than reimbursement for expenses actually incurred for such services. *In the case of volunteer athletic coaches or sports officials, such volunteers shall possess proper certification or validation of competence in the rules, procedures, practices, and programs of the athletic activity.*

RSA 508:17, V(c) (1997) (emphasis added).

█ It is not apparent from the record whether the "employees, coaches, instructors, and referees" that the plaintiffs charge with negligence under Count II meet the definition of "volunteer" under the statute, and the parties have not stipulated that these individuals would be immune if sued personally. Thus, "it was incumbent upon [the defendants as] the moving part[ies] . . . to supply the

court with facts verified by affidavit to support its motion to dismiss." *Gardner*, 137 N.H. at 259, 624 A.2d at 1341; *see* SUPER. CT. R. 57 (superior court will not hear motion grounded on facts unless the facts are apparent from the record, agreed to by the parties, or verified by affidavit). As the defendants have provided no affidavits submitted below establishing the facts necessary to find that the "employees, coaches, instructors, and referees" in Count II would be immune under RSA 508:17, we cannot conclude that the trial court erred in failing to address that argument.

*Affirmed in part; reversed in part; remanded.*

THAYER and BRODERICK, JJ., did not sit; the others concurred.